UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| SUZANNE WINDSOR, | |
| Plaintiff, | |
| v. | |
| BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, MARYLAND, JANICE BRISCOE, *in her official and individual capacities,* KARYN LYNCH, *in her official and individual capacities,* JACQUELINE NAVES, *in her official and individual capacities,* and DOUGLAS ANTHONY, *in his official and individual capacities,* | Civil Action No. TDC-14-2287 |
| Defendants. | |

**MEMORANDUM OPINION**

Plaintiff Suzanne Windsor has filed this employment discrimination suit against the Board of Education of Prince George's County, Maryland ("the Board") and Janice Briscoe, Karyn Lynch, Jacqueline Naves, and Douglas Anthony, all of whom are Board employees sued in their official and personal capacities (collectively, the "Individual Defendants"). Presently pending is Defendants' Motion to Dismiss Windsor's Second Amended Complaint. Having reviewed the submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6 (2016). For the following reasons, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

# BACKGROUND

Windsor is a light-skinned, multiracial woman who began working for the Board of Education of Prince George's County in August 1993 as a classroom teacher. During the 2005-2006 school year, Windsor lodged several complaints about the behavior of an assistant principal at the school where she was teaching. Those complaints made their way to Janet Briscoe, who was then the Associate Superintendent for the region in which Windsor's school was located. Based on Briscoe's handling of the incident as well as other factors, Briscoe was removed from her position as Associate Superintendent at the end of the 2005-2006 school year.

## I.    The 2011 Hearing Officer Position

In 2011, Windsor and Briscoe crossed paths again. By that point, Windsor was working as a Pupil Personnel Worker ("PPW"), a position requiring her to investigate issues of student discipline, including suspension and expulsion, at her assigned schools. Briscoe had the position of Special Projects Officer, which put her in a supervisory position over Windsor. On August 14, 2011, Briscoe sent an email to PPWs announcing five newly-created hearing officer positions within the Board's Office of Appeals. According to Windsor, she was left off of the list of email recipients and never received the announcement. Windsor did not learn of the positions until Briscoe mentioned them at a back-to-school meeting, by which time three of the positions had already been filled. Windsor submitted her application for one of the remaining positions and was given a first-round interview, conducted by Shauna Battle, an attorney for the Board. Windsor was brought back for a second interview, as part of which she was given an opportunity to observe some of the newly hired hearing officers as they conducted hearings. After the interview and observation, Battle informed Windsor that she "did not think" she could offer her a position because Karyn Lynch, the Board's Chief of Student Services, had approved only three,

rather than five, hearing officer positions due to funding constraints. 2d Am. Compl. ¶ 66, ECF No. 52-1. Windsor thus felt that she "had applied for a non-existent position." *Id.* ¶ 67.

Believing that she had missed out on the opportunity to interview for the available positions in the Office of Appeals because she had not received the August 14, 2011 email announcing the openings, Windsor met with Briscoe to discuss how the positions had been posted and the interviews conducted. As part of this conversation, Windsor suggested that the hiring for the Office of Appeals positions had not been done in accordance with the "Negotiated Agreement," the collective bargaining agreement between the Board and the Prince George's County Educators' Association. *Id.* According to Windsor, Briscoe was not receptive to her concerns and dismissed them by asserting that "she could hire anyone that she wanted." *Id.* ¶ 68.

With Briscoe unresponsive, Windsor contacted her union representative, who told her that Windsor had been "black-balled" by Briscoe and that Windsor was generally disliked because she was light-skinned and "pretty." *Id.* ¶ 70. Windsor suggests that when Briscoe learned of Windsor's meeting with her union representative, Briscoe changed Windsor's duty assignment in retaliation. Windsor's "base school" had been Annapolis Road Academy ("Annapolis Road"), but she had also been assisting part-time with pupil placement at Northwestern High School ("Northwestern"), whose main PPW had retired. *Id.* ¶ 71. Briscoe, however, changed Windsor's base school for the 2011-2012 school year from Annapolis Road to Northwestern. Windsor had concerns about working at Northwestern because one of its assistant principals was someone who, Windsor asserts, had harassed her in the past. With Windsor now at Northwestern full time, she could not avoid the assistant principal, who "bad mouthed" Windsor to school staff and made negative reports to Lynch about Windsor. *Id.* ¶ 74.

Windsor complained to Briscoe about the placement, but Briscoe told her to "deal with it" and that she had no intention of moving Windsor out of Northwestern. *Id.* ¶ 75. Windsor then went to Lynch. After explaining her history with Briscoe and the Northwestern assistant principal, Windsor expressed concern about what she believed to be "present discrimination, harassment, and retaliation." *Id.* ¶ 77. Because Windsor was reporting alleged discrimination, Lynch was, Windsor asserts, obligated to follow Administrative Procedure 4170, which requires supervisors who receive reports of alleged discrimination to obtain within five days of the complaint a written responsive statement from the alleged offender. Lynch, however, did not address or pursue Windsor's allegations, but instead "scolded" Windsor for her conduct at Northwestern. *Id.* ¶ 78.

Windsor turned at that point to the Board's Equity Office, filing a report complaining about Briscoe's alleged failure to include her on the August 14, 2011 email advertising the Office of Appeals positions and Lynch's failure to follow Administrative Procedure 4170. The Equity Office arranged a mediation session between Windsor and Briscoe. At that session, Briscoe produced what she asserted was a copy of the August 14, 2011 email announcing the Office of Appeals positions with Windsor listed as a recipient. Two other individuals were listed below Windsor on the recipient list. Windsor later contacted them, and they both told her that they had not received the email. The first woman was African American and was, like Windsor, light-skinned; the second had not even been hired by the Board at the time the email was originally sent. Dubious about the validity of the email Briscoe presented at the mediation, Windsor followed up with the Equity Office. Her efforts went nowhere; instead she was told that "[n]othing will be done, you will not be moved" from the Northwestern placement. *Id.* ¶ 85.

## II.     The EEOC Complaint

By May 2012, Windsor decided she had to go outside the school system for help, so she contacted the Baltimore Office of the United States Equal Employment Opportunity Commission ("EEOC"). She submitted an Intake Questionnaire later that month. Meanwhile, over the summer, Windsor again applied for a position in the Office of Appeals but was not hired, nor did it appear that anyone else was offered the job. She also learned that Briscoe had increased her school caseload from two schools to six, a caseload that she believed was more strenuous than those given to other PPWs.

By the start of 2013, Windsor's formal EEOC Charge of Discrimination ("Charge") had been drafted. As to the bases for discrimination, the boxes for "Race" and "Color" were checked, but "Retaliation" was not. As to the dates of discrimination, the period in question was listed as beginning and ending on August 14, 2011, and the box indicating that the discrimination was a "continuing action" was not checked. The narrative section, which contained several handwritten edits by Windsor, alleged that Windsor was intentionally left off the August 14, 2011 email announcing the Office of Appeals positions. Windsor also stated that she believed that she was given a "more strenuous caseload than my co-workers." EEOC Charge, ECF No. 43-2. She asserted that the reason for this disparate treatment is that she is "bi-racial" and "fair skinned." *Id.* Windsor signed and dated the Charge on January 8, 2013. The Charge was mailed to the Board on January 23, 2013, and the Board was given a deadline of February 23, 2013 to file its response.

On February 12, 2013, Windsor emailed the EEOC to state that she wanted to amend her Charge to include a retaliation claim. On February 17, 2013, Windsor faxed a corrected copy of her Charge to the EEOC. Windsor altered the Charge by checking the box for "Retaliation" and

adding, in the narrative section of the document, that when she reported the August 14, 2011 incident and the alleged caseload disparity to others, she was and continued to be "subjected to retaliation." First Opp'n Mot. Dismiss ("First Opp'n") Ex. D, ECF No. 41-5.  In a letter dated February 19, 2013, the Board responded to Windsor's January 8, 2013 Charge.  The Board indicated that its investigation revealed that there had been two emails sent regarding the positions in the Office of Appeals, one sent on July 27, 2011 and the other on August 2, 2011, and that Windsor had been included on both distribution lists.  *Id.* Ex. E at 1, ECF No. 41-6. The Board also asserted that Windsor's caseload was "equal to those of her colleagues in the same position." *Id.* at 2.  The Board's response, which quoted the January 8, 2013 version of the Charge, made no reference to Windsor's February 17, 2013 allegations of retaliation.  In a mediation session the following month, the parties failed to reach any resolution.

## III.   2013 Incidents

Meanwhile, in January 2013, Windsor applied to be the Supervisor of Pupil Personnel. At a county-wide PPW meeting, Briscoe informed the PPWs that while she had assisted in assembling the hiring committee for that position, she herself would not be on it.  Windsor was interviewed for the position, but it appeared to her that Briscoe had poisoned the committee against her.  When Windsor arrived at the interview, one interviewer allegedly told Windsor that she was familiar with her name, but would not explain how.  Another interviewer, Anthony Boyd, described his plans for Windsor at her current assignment, which she interpreted to mean that he had no intention of hiring her for the supervisory position.  Once in the interview room, Windsor discovered that Battle was also on the interview panel, which she felt was a conflict of interest since Battle had been involved in the Office of Appeals interview process about which Windsor had complained.  Windsor ultimately was not selected for the position.  Instead,

Defendant Jacqueline Naves, whom Windsor asserts is a friend of Briscoe and Boyd, was offered the job.

Windsor contacted the Human Resources Department with her concerns about the composition of her interview panel. In response to Windsor's email, a Department representative informed her that the panel had been selected in accordance with all relevant guidelines. Dissatisfied, Windsor went to the Department to ask for a copy of the guidelines mentioned in the email. She was informed that no such document existed and that if she had further concerns, she should direct them to Defendant Douglas Anthony, who was at that time the Acting Chief of the Human Resources Department. According to Windsor, when she pursued the issue with Anthony, he evaded her questions. Windsor then forwarded her email to the members of the Board, one of whom indicated that the matter should be addressed. In response, Anthony allegedly consulted with Battle before repeating to Windsor that the interview panel had been selected in accordance with Human Resources guidelines but that no document laying out those guidelines existed. As to the guidelines, Anthony explained that it was the practice of Human Resources to ensure that all members of the interview panel held supervisory positions and to screen panel members for any possible bias or conflict of interest. In a later meeting with members of the Human Resources Department, Windsor voiced her belief that her panel had not been selected in accordance with this policy and that it appeared to her that the informality of the Department's procedures had led to discriminatory hiring practices. Her complaints failed to result in any change to the hiring decision.

Windsor asserts that Naves, who had become Windsor's supervisor, then began to retaliate against her by scheduling her for an off-cycle performance evaluation, scheduling and then cancelling multiple appointments, refusing to approve expense requests that had never

previously been denied, and then, at the end of the school year, refusing to provide Windsor with her duty assignment for the subsequent year, as she was obligated to do by the terms of the Negotiated Agreement. This retaliatory activity allegedly continued into the next school year.

At some unspecified point in 2013, Naves announced that the Board would again interview candidates for positions in the Office of Appeals. Windsor applied and was again selected for an interview. The interview panel included Briscoe, a Pupil Personnel Transition Worker, and a non-supervisory secretary, and thus had not been selected in accordance with the guidelines that Anthony had described to Windsor. Windsor contacted Anthony with her concerns, who responded that some of his subordinates were better at following HR directives than others and that he would try to ensure that any future interview panels were properly selected. Anthony also "insisted" that Windsor discuss her concerns with Douglass Williams, the new Chief of Student Services, who had previously invited Windsor to shadow him during the workday. 2d Am. Compl. ¶ 126. Immediately prior to that meeting, however, Windsor observed Naves enter Williams's office. Windsor asserts that, following Naves's conversation with Williams, Williams's demeanor towards her became "abrasive." *Id.* ¶ 128. Williams later rescinded his offer to allow Windsor to shadow him and, in Windsor's estimation, did not follow up on the concerns she expressed at their original meeting.

Throughout this period, Windsor sent a series of emails to the EEOC to describe acts that she perceived to be retaliation, including the inclusion in 2013 of Briscoe on her interview panel for a position in the Office of Appeals. In a July 3, 2013 email, Windsor also inquired about the progress of the investigation and expressed her interest in amending and correcting her charging document because the current document "left out quite a bit of the information I originally submitted." First Opp'n Ex. G, ECF No. 41-8. The EEOC responded by informing Windsor

8

that her case was still under investigation and that she did not "have to do a new charge every time something on the job happens that you feel is retaliation." *Id.*

## IV.   Procedural History

On April 22, 2014, the EEOC issued Windsor a Right to Sue letter. Corr. First Mot. Dismiss Ex. 3, ECF No. 43-3. On July 18, 2014, Windsor, proceeding *pro se*, filed suit in this Court. On August 29, 2015, Windsor, now represented by counsel, filed her Second Amended Complaint alleging nine causes of action: (1) color discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-7 (2012); (2) a hostile work environment based on race and color, in violation of Title VI; (3) retaliation, in violation of Title VI; (4) color discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-4; (5) a hostile work environment based on race and color, in violation of Title VII; (6) retaliation, in violation of Title VII; (7) race and color discrimination in violation of 42 U.S.C. § 1981; (8) infringement of her due process and equal protection rights in violation of 42 U.S.C. § 1983; and (9) breach of contract. Windsor appears to allege all causes of action against all Defendants, although her pleading on this score is not precise. On December 1, 2015, Defendants filed a Motion to Dismiss Windsor's Second Amended Complaint. Windsor filed her Response on December 22, 2015, and Defendants filed their Reply on January 7, 2016.

## DISCUSSION

Defendants move to dismiss some of Windsor's Title VII claims under Federal Rule of Civil Procedure 12(b)(1) and seek to dismiss all of her remaining claims under Rule 12(b)(6). As to dismissal pursuant to Rule 12(b)(1), Defendants argue that Windsor has not exhausted her administrative remedies as to her Title VII hostile work environment and retaliation claims. Under the precedent of the United States Court of Appeals for the Fourth Circuit, a failure to

exhaust administrative remedies under Title VII should be addressed by way of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).[1]  *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009).  On a Rule 12(b)(1) motion, the plaintiff bears the burden of proving that subject matter jurisdiction exists, while a defendant may assert either (1) a facial challenge that the allegations as stated in the complaint are not to sufficient to establish subject matter jurisdiction, or (2) a factual challenge that the allegations establishing jurisdiction are not true.  *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  Defendants assert a factual challenge, arguing that Windsor did not, in fact, exhaust her administrative remedies as to her hostile work environment and retaliation claims.

Pursuant to Rule 12(b)(6), Defendants argue (1) that Windsor's Title VII claims cannot proceed against the Individual Defendants, and that she fails to plead adequate facts to state a viable Title VII failure to hire claim; (2) that Windsor's Title VI claims fail because Windsor does not adequately plead that the Board received federal funds that it used primarily for employment purposes and because the bulk of those claims arose outside of the applicable statute of limitations period; (3) that Windsor's § 1983 claims against the Board and the Individual Defendants in their official capacities are barred by the Eleventh Amendment to the United States Constitution, and that Windsor's § 1983 claims against the Individual Defendants in their

---

[1]   Whether failure to exhaust administrative remedies is always a subject matter jurisdiction question has not been definitively established.  The Supreme Court has noted that "[o]n the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous," *Arbaugh v. Y & H Corporation*, 546 U.S. 500, 511 (2006), and has "cautioned" against "profligate use of the term . . . 'jurisdictional.'" *Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers*, 558 U.S. 67, 82 (2009).  Notably, the Fourth Circuit has held that the question whether an administrative claim was timely filed with the EEOC is *not* jurisdictional.  *Edelman v. Lynchburg College*, 300 F.3d 400, 404 (4th Cir. 2002).

personal capacities are either time-barred or fail to state a claim; (4) that Windsor's § 1981 claims against the Board and the Individual Defendants in their official capacities are barred by the Eleventh Amendment, and that § 1981 claims against the Individual Defendants in their personal capacities fail either because they are time-barred or because they may only be brought under § 1983; and (5) that Windsor's breach of contract claims must be dismissed because Windsor failed to exhaust the grievance procedures set forth in the governing Collective Bargaining Agreement.

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

I.     **Exhaustion of Administrative Remedies**

Defendants argue that Windsor's Title VII hostile work environment and retaliation claims must be dismissed because those claims were not included in Windsor's EEOC Charge of Discrimination. Before filing suit under Title VII, a plaintiff is required to file an administrative charge of discrimination with the EEOC. 42 U.S.C. § 2000e–5(f)(1). The "EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). The EEOC Charge must contain allegations "sufficiently precise to identify the parties, and to describe generally the actions or practices

complained of." *Chacko v. Patuxent Institution*, 429 F.3d 505, 508 (4th Cir. 2005) (quoting 29 C.F.R. §1601.12(b) (2004)). If the claims asserted in a civil action "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Id.* at 509.

## A.    Hostile Work Environment

Applying this standard here, Windsor's Title VII hostile work environment claim must be dismissed. For a work environment to be hostile within the meaning of Title VII, the harassment to which an employee is subjected must be so "severe or pervasive" that it creates an "abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Windsor's Charge indicated that the alleged discriminatory acts began and ended on August 14, 2011, and the Charge contained no check in the box for a "Continuing Action." Further, the narrative section detailed only Windsor's contention that she was not sent the email advertising the positions at the Office of Appeals and that she had a higher caseload than her peers. Windsor made no allegations in her Charge of an uncomfortable, much less pervasively abusive, daily working environment. To the extent that Windsor claims that she raised this issue through other communications with the EEOC, the Fourth Circuit has adopted a rigid rule that letters, emails, and other submissions to the EEOC cannot be deemed to have effected an amendment of the Charge and instead requires that any amended allegations be formally made on the face of the Charge itself. *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 408 (4th Cir. 2013). Thus, Windsor's Title VII hostile work environment claim is beyond the scope of the Charge and is procedurally barred.

**B.      Retaliation**

Windsor's Title VII claim of retaliation is more complicated.  Windsor appears to allege three different genealogies of retaliation.  The first is that Briscoe left her off the August 14, 2011 email list or increased her workload as retaliation for their interactions in 2005-2006.  The second is that Briscoe increased her workload in retaliation for Windsor's decision to pursue a grievance against Briscoe relating to the August 14, 2011 email incident.  The third, reading the Complaint in the light most favorable to Windsor, is that the Defendants retaliated against Windsor in later hiring processes in response to Windsor's filing of her EEOC Complaint.

Windsor's EEOC Charge filed on January 8, 2013 included checks in the boxes for "Color" and "Race" as the bases for the alleged discrimination, but conspicuously did not include a check in the box for "Retaliation." Although the check boxes are not necessarily dispositive on this issue, in order for Windsor to have raised these particular retaliation claims, she must at least have alleged relevant facts in the narrative description on the EEOC Charge Form.  *See Chacko*, 429 F.3d at 509 ("[T]he factual allegations made in formal litigation must correspond to those set forth in the administrative charge.").  She did not.  She made no assertion that she was not sent the August 14, 2011 email or given a higher workload as retaliation for prior incidents, nor did she cast her alleged caseload disparity as retaliation for complaining about the August 2011 incident.

Windsor argues that the operative EEOC Charge document is the version she sent to the EEOC on February 17, 2013, which included allegations of retaliation.  The fact that Windsor made her changes to the face of the Charge and submitted the altered form as an amended Charge distinguishes it from the informal submissions that must be excluded from consideration.  *See Balas*, 711 F.3d at 408 ("[W]e are not at liberty to read into administrative charges

allegations they do not contain.  Instead, persons alleging discrimination have a different form of recourse if they determine that their initial charge does not read as they intended:  they may . . . file an amended charge with the EEOC.").  Although the February 2013 form does not appear to have been formally processed or forwarded to Defendants, where Windsor submitted it as an amended Charge, she should not be penalized for this failure where the EEOC is statutorily obligated to provide an EEOC Charge to the employer.  *See* 42 U.S.C. § 2000e-5(b); 29 C.F.R. § 1601.14 (2016); *cf. Balas*, 711 F.3d at 408 (rejecting the argument that a plaintiff should not be penalized for the EEOC's failure to send an intake questionnaire and letter to the employer because the EEOC had no obligation to forward such informal documents).  The Court therefore considers the February 17, 2013 Charge.

In that document, Windsor added a check to the box for "Retaliation."  In the narrative section, following the existing text in which Windsor asserted that she did not receive the email because she is "fair skinned and multiracial" and her statement that she is given a more strenuous caseload than others, she added "[w]hen I reported this to others, I was subjected to retaliation." First Opp'n Ex. D at 3.  Her other amendment was to add after her general claim that she has been subjected to race and color discrimination that "I . . . continue to receive/be subjected to retaliation." *Id.*  Although a plaintiff's Title VII claims are limited to what is contained in the EEOC Charge, in determining the scope of the Charge, a court should construe the claims in the Charge with "utmost liberality" and consider any claims "that would naturally have arisen from an investigation." *Balas*, 711 F.3d at 407-08.  Even under this generous standard, there is no way to read Windsor's Amended Charge as stating or implying that the August 2011 email incident or the increased workload were acts of retaliation for protected activity that pre-dated

the email incident.  To the extent that Windsor seeks to assert such a retaliation claim here, that claim is dismissed.

However, read liberally, the Charge could be construed as asserting that when Windsor complained about the email incident to others, she was subjected to retaliation that included the increased workload.  At a minimum, the Court concludes that Windsor's allegation that the increased workload was itself a form of retaliation against her for complaining about the email incident "would naturally have arisen" during the course of the investigation.  *Id.*  Thus, Windsor's claim that the increased caseload was retaliation for her complaints about the August 2011 email incident may proceed.

As to the third allegation of retaliation, stemming from allegedly unfair hiring processes post-dating Windsor's filing of her EEOC Charge, this claim may also proceed.  The Fourth Circuit has held that a plaintiff raising a claim of retaliation for filing a previous EEOC charge need not exhaust administrative remedies on that claim, but instead may raise it for the first time in federal court.  *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992).  The rationale behind this rule is that such a claim falls within the general rule that a Title VII lawsuit may extend to "any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission," and that it is impractical to expect victims of employment discrimination to file a new EEOC charge for retaliation if they have already been retaliated against for filing the first EEOC charge.  *Id.*  Thus, to the extent that Windsor alleges that the later failure to promote her to various positions was

15

the result of Defendants' retaliation for the filing of her EEOC Complaint, that claim may proceed.[2]

Defendants' Motion to Dismiss is therefore granted as to Windsor's Title VII hostile work environment claim and Windsor's Title VII retaliation claim that the August 14, 2011 email and the change in her caseload were retaliation for complaints she lodged before the email incident. The Motion is denied as to Windsor's Title VII retaliation claims that her increased workload was a form of retaliation for complaining about the email incident and that she was subjected to allegedly unfair hiring practices in retaliation for filing her January 8, 2013 EEOC Charge.

## II.    Title VII

### A.    Individual Defendants

Windsor asserts her Title VII claims against the Board and the Individual Defendants in both their official and personal capacities. Defendants correctly argue that all of Windsor's Title VII claims against the Individual Defendants, even those she properly exhausted, must be dismissed. Title VII creates a cause of action against only employers, not individual supervisors. 42 U.S.C. § 2000e-2(a) (stating that Title VII's provisions apply to an "unlawful employment practice [of] an employer"). After analyzing the language of Title VII and considering its remedial scheme, the Fourth Circuit has held that "supervisors are not liable in their individual capacities for Title VII violations." *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998). Moreover, the claims against the Individual Defendants in their official capacities are

---

[2]    The Court notes that to the extent that Windsor seeks to assert race or color discrimination claims relating to these 2013 incidents of failure to promote, they would be barred for failure to exhaust administrative remedies because they were not referenced in the EEOC Charge.

duplicative of the claims against the Board and are therefore subject to dismissal. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (stating that suits against government officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent") (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)); *cf. Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (dismissing a 42 U.S.C. § 1983 official capacity claim against a school superintendent as duplicative of a claim against the school board). Thus, the Title VII claims against the Individual Defendants in both their official and personal capacities are dismissed. Windsor's remaining Title VII claims of race and color discrimination and of retaliation, as limited above, may therefore proceed only against the Board.

### B.     Failure to Hire

Defendants assert that Windsor's "failure to hire" claim should be dismissed under Rule 12(b)(6) because the Amended Complaint fails to allege sufficient facts to state a plausible claim for relief. This claim consists of Windsor's allegation of color discrimination arising from Briscoe's failure to notify her of the hearing officer positions through the August 2011 email.

In order for Windsor to establish a *prima facie* case of color discrimination based on a failure to hire or promote, Windsor must show that: (1) she is a member of a protected class; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position "under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F. 3d 898, 902 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Although it is not strictly necessary for a plaintiff to establish all elements of a *prima facie* case in the complaint, a plaintiff must allege sufficient facts to support a plausible inference of discrimination and thereby raise a right to

17

relief above the speculative level. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–15 (2002); *Coleman v. Md. Ct. Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Defendants have not challenged any of the first three elements. The only contested issue is whether Windsor has pleaded facts that adequately allege that she was not offered the hearing officer position in the Office of Appeals as a result of color discrimination.

Windsor makes only two specific allegations of specific color animus related to her failure to be hired in 2011 for the Office of Appeals position. First, she alleges that Briscoe left only her and another light-skinned woman off the August 2011 email distribution list for the announcement of the hearing officer positions, from which she concludes that Briscoe was motivated by color discrimination. The second is her assertion that when she complained about the incident to her union representative, she was told by the representative that she was generally disliked because she was light-skinned and pretty. She also notes that the failure to send her the notice effectively barred her from the position because the three positions that were ultimately available were filled before she received notice that the Office of Appeals was hiring. Construing the allegations in the light most favorable to Windsor, as the Court is required to do on a Motion to Dismiss, the Court cannot say that Windsor's resulting conclusion—that the color of her skin played a role in Briscoe's exclusion of her from the job posting email—is implausible. The Court denies the Motion to Dismiss the Title VII claim for color discrimination arising from the 2011 failure to hire Windsor as a hearing officer.

## III.   Title VI

Windsor alleges violations of Title VI based on color discrimination, retaliation, and hostile work environment. Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin . . . be subjected to discrimination under any program or

activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Defendants seek dismissal of Windsor's Title VI claims based on their assertions that (1) the Individual Defendants are not subject to suit under Title VI, (2) Windsor has failed to allege that the Board received federal funds within the meaning of Title VI, and (3) the statute of limitations bars any Title VI claims arising prior to July 18, 2012.

### A.     Individual Defendants

As a threshold matter, Defendants are correct that the Individual Defendants are not subject to suit under Title VI because those Defendants are not programs or activities that have received any federal funds within the meaning of Title VI. *See Buchanan v. City of Bolivar, Tennessee,* 99 F.3d 1352, 1356 (6th Cir. 1996) (finding that the plaintiff's Title VI claims against individual school employees failed because it was the school, not its employees, who would be the recipient of federal monies); *see also Foster v. Michigan*, 573 F. App'x 377, 389-90 (4th Cir. 2014) (holding that a plaintiff may only assert Title VI claims against the entity receiving federal funding); *Bishop v. Lewis*, No. WMN-10-3640, 2011 WL 1704755 at *3 (D. Md. May 4, 2011) (dismissing a Title VI claim against an individual because "Title VI liability is premised on the receipt of federal funds," and any such funds "would be received by a governmental agency and not by an individual"). Thus, the Title VI claims against the Individual Defendants in their individual capacities must be dismissed. The Title VI claims against the Individual Defendants in their official capacities are redundant of the claims against the Board and are thus also subject to dismissal. *See Graham*, 473 U.S. at 165-66; *Foster*, 573 F. App'x at 390. The Title VI claims may therefore proceed against the Board only.

## B.     Federal Funding

A plaintiff can prevail on a Title VI claim for employment discrimination only upon a showing that the employer receives federal funding and that "a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. 2000d-3; *see Venkatraman v. REI Systems, Inc.*, 417 F.3d 418, 420-21 (4th Cir. 2005) (listing as one of the elements of a Title VI claim of employment discrimination that "providing employment is a primary objective of the federal aid" that the employer receives). Defendants claim that Windsor has failed properly to allege that the Board received such funding after September 30, 2012, such that any claims arising after that date would fail.

Windsor, however, alleges that from August 10, 2010 through the 2013-2014 school year, the Board received federal funds, and she provides supporting Board documents. She further alleges that those monies were used for the express purposes of creating and maintaining jobs. Although Defendants challenge this assertion, it is premature to weigh the evidence on this point. Defendants incorrectly characterize the federal funding requirement as "jurisdictional" rather than as simply an element of a Title VI cause of action that need only be alleged at the pleading stage. *See Venkatraman,* 417 F.3d at 420-21. Construing Windsor's allegation as true, as the Court is required to do on a motion to dismiss, Windsor has adequately alleged that the Board received federal funding to provide employment throughout the time period of the alleged discrimination and retaliation. This aspect of the Motion to Dismiss is denied. The Court also denies Defendants' request for a special jury trial on the federal funding question as entirely premature.

C.    **Statute of Limitations**

The Board also asserts that any Title VI claims based on events prior to July 18, 2012 must be dismissed as barred by the applicable statute of limitations.  The statute of limitations is an affirmative defense for which the defendant bears the burden of proof.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  A court may therefore reach the issue of the statute of limitations on a motion to dismiss only if facts establishing that the claim at issue is time-barred clearly appear on the face of the complaint.  *Id.*; *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).  Here, the Board relies for its argument on the facts Windsor pleads in her Complaint, so the Court considers whether certain claims are subject to dismissal as time-barred.

Although Title VI does not have an express statute of limitations, it borrows the limitations period from the most analogous state law.  *See Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) (applying Maryland's general three-year limitations period to a Title VI claim, prior to the 2009 enactment of Maryland's employment discrimination statute); *see also Moore v. Greenwood Sch. Dist. No. 52*, 195 F. App'x 140, 143 (4th Cir. 2006) (applying the statute of limitations for the South Carolina anti-discrimination statute to a Title VI claim).  Maryland law applies a two-year statute of limitations for employment discrimination actions.  Md. Code Ann., State Gov't §§ 20-606(a)(1)(i), 20-1013(a)(3) (2015).  As that statute maps directly onto Windsor's claims in this case, the Court applies this two-year limitations period to Title VI claims of employment discrimination.  Here, Windsor filed her initial complaint on July 18, 2014.  Therefore, any Title VI claims based on allegedly unlawful employment practices that occurred before July 18, 2012 are barred.  In particular, based on the dates referenced in the Complaint, Windsor's Title VI claim that she was

subjected to color discrimination when Briscoe did not notify her of the hearing officer positions through the August 14, 2011 email is time-barred.

## IV.    42 U.S.C. § 1983

Defendants seek dismissal of Windsor's claims under § 1983 based on the Eleventh Amendment, the statute of limitations, and the failure to state a claim.

### A.    Sovereign Immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment immunizes states, state agencies, state instrumentalities, and state officials sued in their official capacities from suit by private parties in federal court. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984); *Bland v. Roberts*, 730 F.3d 368, 389–91 (4th Cir. 2013) (holding that federal court claims for damages against a state official in his official capacity are barred by the Eleventh Amendment).

In Maryland, county boards of education are state agencies. *Beka Indus., Inc. v. Worcester Cty. Bd. of Ed.*, 18 A.3d 890, 900 (Md. 2011) (holding that "a county board of education is a State agency entitled to governmental immunity") (internal quotation marks and citation omitted). Under Maryland law, "a county board of education may not raise a defense of sovereign immunity to any claim of $100,000 or less." Md. Code Ann., Cts. & Jud. Proceed. § 5-518(c) (2011). The Court of Appeals of Maryland has held that this provision waives a board of education's Eleventh Amendment immunity for suits seeking less than $100,000. *Board of Ed. v. Zimmer-Rubert*, 973 A.2d 233, 243 (Md. 2009). Here, however, Windsor seeks damages

of $3,000,000, so the waiver does not apply, and the protections of the Eleventh Amendment remain intact. The § 1983 claims against the Board are therefore dismissed.

As for the § 1983 claims against the Individual Defendants in their official capacities, the Supreme Court has stated that such claims are the equivalent to suits against the State, to which Eleventh Amendment immunity would apply. *See Graham*, 473 U.S. at 165–69 (stating that a § 1983 official capacity suit should "be treated as a suit against the entity"). Those claims are also dismissed pursuant to Eleventh Amendment immunity.

However, Eleventh Amendment immunity does not extend to § 1983 claims against the Individual Defendants in their personal capacities. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "Officers sued in their personal capacity come to court as individuals" rather than as extensions of the State. *Id.* at 27. The motion to dismiss the § 1983 claims based on sovereign immunity is therefore denied as to the claims against the Individual Defendants in their personal capacities.

**B.      Statute of Limitations**

Defendants assert that to the extent that Windsor bases her § 1983 claim on events prior to July 18, 2011, those claims would be barred by a three-year statute of limitations. Windsor, however, has clarified that she seeks § 1983 liability only for events that occurred "during and/or after the summer of 2011." First Opp'n ¶ 5. Because Windsor has voluntarily abandoned any § 1983 claim arising prior to July 18, 2011, the Court need not, and so does not, address Defendants' statute of limitations argument.

**C.      Failure to State a Claim**

Defendants also assert that the § 1983 claims should be dismissed because Windsor has neither identified any constitutional right that was violated nor adequately alleged how Defendants are responsible for such a violation. Windsor asserts only that Defendants violated

23

her "constitutional right to due process and right to be free from discrimination." 2d Am. Compl. at 49. The Court construes this assertion to mean that Windsor is alleging a § 1983 claim based both on her due process and her equal protection rights under the Fourteenth Amendment to the United States Constitution.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection claim, a plaintiff must allege facts establishing that she has been treated differently from others with whom she is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Because the Court has already found that Windsor has pleaded sufficient facts to support a color discrimination claim arising from the August 14, 2011 email incident, it likewise concludes that she has stated a plausible § 1983 equal protection claim.

As for Windsor's allegation of a § 1983 cause of action based on a violation of her due process rights, the Court dismisses any such claim. The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1. Windsor in no way explains how her due process rights were violated. Arguably, she claims that flawed hiring processes prevented her from obtaining various promotions, such that she "suffered economic losses" and her "future earning capacity has been damaged." 2d Am. Compl. at 49. These allegations are insufficient to state a due process injury. To have a property interest protected by the Fourteenth Amendment's guarantee of due process, an individual must have "more than a unilateral expectation" to secure the property at issue, but instead must have "a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Windsor has not asserted, nor does

24

it appear that she can assert, that the positions for which she applied are property interests protected by the Fourteenth Amendment. *See id.* at 578 (rejecting a plaintiff's claim that he had a due process right to a hearing on the university's decision not to rehire him for a non-tenure-track position because he had no legitimate claim that he was entitled to such re-employment). Windsor therefore fails to state a viable § 1983 due process claim.

The Motion to Dismiss the § 1983 claims is therefore granted in part and denied in part. Windsor's § 1983 claims may proceed against the Individual Defendants in their personal capacities to the extent they are based on a violation of equal protection rights. All other § 1983 claims are dismissed.

## V.   42 U.S.C. § 1981

Windsor also alleges claims against the Board and the Individual Defendants under 42 U.S.C. § 1981. In relevant part, § 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licensees, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (2012). Section 1981 prohibits intentional discrimination based on race in contracting and certain other activities, *Gen. Bldg. Contractor's Ass'n v. Pennsylvania*, 458 U.S. 375, 384-86, 391 (1982), and is frequently used to assert employment discrimination claims against private actors, *see, e.g., Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 211 (4th Cir. 2007); *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999). "[A] misuse of governmental power motivated by racial animus," "comes squarely within the 'equal benefit' and 'like punishment' clauses of section 1983(a)." *Alexis v. McDonald's Rests. of Mass., Inc.*, 67 F.3d 341, 348 (1st Cir. 1995).

Defendants argue that the § 1981 claims against the Board and the Individual Defendants in their official capacities must be dismissed based on Eleventh Amendment immunity. For the same reasons that the § 1983 claims are barred by the Eleventh Amendment, the Court finds that these § 1981 claims must also be dismissed. *See supra* part IV.A.; *Huang v. Bd. of Governors of Univ. of North Carolina*, 902 F.2d 1134, 1138 (4th Cir. 1990) (noting that because it is "well settled that the Eleventh Amendment bars a suit by private parties to recover money damages from the state or its alter egos acting in their official capacities," the plaintiff "properly concedes that the Eleventh Amendment bars [his] § 1981 … damage claims").

Defendants further argue that the § 1981 claims against the Individual Defendants in their personal capacities must be dismissed because United States Supreme Court and Fourth Circuit precedent establish that 42 U.S.C. § 1983, which allows individuals to sue government officials who violate their federal rights, is the only avenue through which to enforce § 1981 rights against a state actor. In *Jett v. Dallas Independent School District*, 491 U.S. 701, 736 (1989), the Supreme Court stated: "We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides for the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id.* at 736. Congress then amended § 1981 through the Civil Rights Act of 1991 ("the 1991 Amendment") to add the following provision: "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C § 1981(c). The Ninth Circuit has since held that § 1981(c) effectively superseded *Jett* and established a private right of action under § 1981 against state actors. *Federation of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1205 (9th Cir. 1996). The Fourth Circuit, however, has held

26

that § 1981(c) does not alter the holding of *Jett*, such that "the § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities." *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1989) (citation omitted).

In Maryland, county boards of education are state agencies. *Beka Indus.*, 18 A.3d at 900. In turn, Board officials sued in their official capacity are also state actors. *See Graham*, 473 U.S. at 165–69. Thus, *Jett* and *Dennis* provide an additional basis by which to dismiss the § 1981 claims against the Board and the Individual Defendants in their official capacities.

However, the § 1981 claims against the Individual Defendants in their personal capacities remain. *See Stout v. Reuschling*, No. TDC-14-1555, 2015 WL 1461366 at *6-7 (D. Md. Mar. 27, 2015). In *Stout*, this Court addressed this precise issue and concluded that analysis of *Jett*, *Dennis*, and the 1991 Amendment reveals that the rule articulated in those cases applies only to lawsuits against state or municipal entities, not to personal capacity suits brought against government officials. *See id.* In *Jett*, the specific issue addressed by the Supreme Court was whether "§ 1981 provides an independent federal cause of action for damages against local government entities, and whether such a cause of action is broader than the damages remedy available under 42 U.S.C. § 1983, such that a municipality may be held liable for its employees' violations of § 1981 under a theory of *respondeat superior*," a form of liability unavailable under § 1983. *Jett*, 491 U.S. at 705. In concluding that it does not, *Jett* emphasized that the consequence of the holding is that "the school district may not be held liable for its employees' violations of the rights enumerated in § 1981 under a theory of *respondeat superior*." *Id.* at 738. Thus, *Jett* apparently addressed only whether § 1981 claim could be asserted against a state or municipal entity.

In *Dennis*, which involved a § 1981 action asserted against a county government, the Fourth Circuit acknowledged that the 1991 Amendment had changed the landscape, but concluded that it did not alter the "aspect of *Jett*" holding that "the § 1983 requirement that plaintiffs show an official policy of discrimination also controls in § 1981 actions against state *entities*." *Dennis*, 55 F.3d at 156 & n.1 (emphasis added). The court then noted that "the correct reading of the amendment" is found in an opinion from the United States District Court for the Southern District of New York, *Philippeaux v. North Central Bronx Hospital*, 871 F. Supp. 640 (S.D.N.Y. 1994). *Id.* at 156 n.1. In *Philippeaux*, the court limited the currently applicable holding of *Jett* to the propositions that "(1) there is no vicarious liability for municipalities under Section 1981, and (2) municipal liability for public officials' violations of Section 1981 must be found under Section 1983 using the *Monell* analysis." *Philippeaux*, 871 F. Supp. at 655. Thus, regardless of whether *Jett* was originally limited to § 1981 actions against state and municipal entities, it is now so limited.

Indeed, since *Jett* and *Dennis*, § 1981 claims have proceeded against individual government officials. *See, e.g.*, *Alexis*, 67 F.3d at 348; *Gray v. Maryland*, 228 F. Supp. 2d 628, 639 (D. Md. 2002); *Morrow v. Farrell*, 187 F. Supp. 2d 548, 553 (D. Md. 2002). To bar § 1981 claims against government officials sued in their personal capacities would be inconsistent with the plain language of the 1991 Amendment, which provides that § 1981 protects against impairment of rights "under color of State law." 42 U.S.C. § 1981(c). Notably, the unpublished Fourth Circuit cases referenced by Defendants involved claims against state or municipal entities, not government officials sued in their individual capacities. *See Farmer v. Ramsay*, 43 F. App'x 547, 548, 553 n.8 (4th Cir. 2002) (finding no independent § 1981 cause of action against the University of Maryland School of Medicine); *Lewis v. Robeson Cty.*, 63 F. App'x

134, 138 (4th Cir. 2003) (in a case against a county government agency, stating that "the § 1983 requirement that plaintiffs show an official policy or custom of discrimination controls in § 1981 actions against state entities").

In *James v. Univ. of Maryland, Univ. College*, No. PJM-12-2830, 2013 WL 3863943 (D. Md. Jul. 23, 2013), cited by Defendants, the court noted that since *Jett* and the 1991 Amendment, several other circuits have held, consistent with *Dennis*, that § 1981 claims against state actors are unavailable. *Id.* at *2. However, all but one of the circuits to address this issue have not faced the question here, whether government officials can be sued in their personal capacities under § 1981. Instead, these courts have discussed the continuing viability of *Jett* as it relates to suits against a government entity or state officials sued in their official capacities. *See Brown v. Sessoms*, 774 F.3d 1016, 1021 (D.C. Cir. 2014) (analyzing the § 1981 claim as it related to the Board of Trustees of a public university); *Campbell v. Forest Preserve District of Cook County*, 752 F.3d 665 (7th Cir. 2014) (analyzing a § 1981 claim against a municipality); *McGovern v. City of Philadelphia*, 554 F.3d 114, 118 (3d Cir. 2009) (same); *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006) (same); *Oden v. Oktibbehea County*, 246 F.3d 458, 463-64 (5th Cir. 2001) (dismissing § 1981 claims against a municipality and a sheriff sued in his official capacity based on *Jett* and separately determining that the claims against the sheriff in his individual capacity could not proceed because his allegedly discriminatory actions were taken in his official capacity); *Butts v. County of Volusia*, 222 F.3d 891, 894-95 (11th Cir. 2000) (analyzing a § 1981 claim against a municipality).

Only the United States Court of Appeals for the Sixth Circuit has expressly held that § 1981 claims against government officials in their individual capacities are precluded by *Jett*. *See McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012). In *McCormick*, however, the

Court's analysis focused exclusively on *Jett* and the Supreme Court's analysis of the legislative history of the original § 1981 statute, but made no reference to the intervening 1991 Amendment. *Id.* In the absence of controlling precedent on the specific question whether § 1981 claims against government officials in their personal capacities are precluded, the Court adheres to its analysis above and in *Stout* and will not dismiss the personal capacity claims alleged here.

Defendants also argue that Windsor's § 1981 claim must be narrowed, based on a four-year statute of limitations, to claims arising after July 18, 2010. In her Opposition to Defendants' Motion, Windsor clarifies that her claims are based on incidents "that occurred during and after the summer of 2011," presumably beginning with the August 2011 email incident. First Opp'n ¶ 5. Because Windsor has voluntarily abandoned any § 1981 claims that might fall outside the applicable statute of limitations, the Court need not address Defendants' § 1981 statute of limitations argument.

Defendants make no other arguments for dismissal of Windsor's § 1981 claims. Accordingly, the Motion to Dismiss the § 1981 claims is granted as to the claims against the Board and the Individual Defendants in their official capacities, but denied as to the claims against the Individual Defendants in their personal capacities.

## VI.    Breach of Contract

Finally, Windsor asserts a state law breach of contract claim alleging that Defendants breached the Negotiated Agreement on multiple occasions and in multiple ways. The Negotiated Agreement is a collective bargaining agreement ("CBA") and thus is governed by the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 141-191 (2012). Section 301 of the LMRA provides a cause of action for an alleged breach of a CBA by an employer. 29 U.S.C. § 185(a). "Any state-law cause of action for violation of collective-bargaining agreements is entirely

displaced by federal law under § 301." *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 368 (1990); *Davis v. Bell Atlantic-West Virginia, Inc.*, 110 F.3d 245, 247 (4th Cir. 1997). Thus, Windsor's state law breach of contract claim must either be treated as a § 301 claim or dismissed as preempted by federal labor law. *Davis*, 110 F.3d at 247.

Even if the Court construes Windsor's claim as a § 301 cause of action, the Court agrees with Defendants that it is subject to dismissal because Windsor has not exhausted the grievance procedures contained in the Negotiated Agreement. In general, union members with a grievance under the CBA "must attempt to use the contract grievance procedure agreed upon by employer and union as the mode of redress." *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). Thus, if an employee "resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been exhausted." *Vaca v. Sipes*, 386 U.S. 171, 184 (1967). This rule does not apply if the grievance procedure was not intended to be the exclusive remedy for breaches of the CBA. *Id.* at 184 n.9.

Because Windsor specifically references the Negotiated Agreement in her Complaint in order to assert the breach of contract claim, and Defendants effectively provided the Negotiated Agreement to the Court with its Motion by including an electronic link to the document, the Court may consider it on the motion to dismiss as a document integral to the Complaint of undisputed authenticity. *See Am. Chiropractic Assoc., Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). The Negotiated Agreement contains a grievance procedure that applies to all grievances arising under the Negotiated Agreement, with the exception of those relating to teacher evaluations or reductions in force. *See* Negotiated Agreement § 4.02(B)(2) (defining "grievance") *available at* http://www1.pgcps.org/humanresources/index.aspx?id=7332 (last

visited Sept. 13, 2016).[3]   The Negotiated Agreement neither explicitly provides that the grievance procedure is the exclusive means to resolve disputes arising under the Agreement nor specifically states that the grievance procedure need not always be followed.  In the absence of language exhibiting a "clear understanding" that employees are "free to avoid the contract procedure . . . in favor of a judicial suit," Windsor is required to exhaust the grievance procedure before bringing a contract claim in federal court.  *Republic Steel*, 379 U.S. at 658-59 ("Any doubts must be resolved against such an interpretation").

Windsor does not claim that the grievance procedure was not mandatory for contract disputes arising under the Negotiated Agreement or that she exhausted the procedure.  Instead, she offers language from Administrative Procedure 4170, the Board's Discrimination and Harassment Policy, which states that the procedures contained in that policy are not a prerequisite to filing a discrimination complaint with a local, state, or federal agency.  Administrative Procedure 4170, however, addresses the handling of allegations of discrimination, not allegations of a breach of the CBA.  Administrative Procedure 4170 is thus irrelevant to Windsor's claim of a breach of the Negotiated Agreement.  Windsor's breach of contract claim, construed as a § 301 claim, is therefore dismissed for failure to complete the grievance procedure.  *See Vaca*, 386 U.S. at 184; *Mullins v. Int'l Union of Operating Engineers*, 214 F. Supp. 2d 655, 667 (E.D. Va. 2002) (rejecting a plaintiff's claim for breach of a collective bargaining agreement because she did not exhaust the grievance procedure).

---

[3]   The Court takes judicial notice of the electronic copy of the Negotiated Agreement.  Fed. R. Evid. 201(b)(2).

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Count Five (Title VII hostile work environment) and Count Nine (breach of contract) are dismissed in their entirety. The remaining Title VI, Title VII, § 1981, and § 1983 claims are dismissed with the exception of:

1. The Title VII claims against the Board that (1) Windsor was subjected to color discrimination relating to the August 2011 hearing officer hiring decision and subsequent increase in workload; (2) the increased workload in 2011 was in retaliation for Windsor's complaint about the August 2011 incident; and (3) the failure to promote Windsor in 2013 was in retaliation for the January 2013 EEOC complaint;

2. The Title VI claims against the Board for color discrimination, hostile work environment, and retaliation arising on or after July 18, 2012;

3. The § 1983 equal protection claims against the Individual Defendants in their personal capacities; and

4. The § 1981 claims against the Individual Defendants in their personal capacities.

A separate Order shall issue.


Date:  September 13, 2016

THEODORE D. CHUANG
United States District Judge